No. 21-mj-2243-MBB

## AFFIDAVIT OF SPECIAL AGENT JAY M. LYNCH
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Jay M. Lynch, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since March 2020. I am currently assigned to the domestic terrorism squad at the Boston Division of the FBI. I have received training in a variety of investigative and legal matters and have assisted in drafting affidavits in support of warrants and complaints. Additionally, I have conducted or participated in physical and electronic surveillance, assisted in the execution of search warrants, and reviewed pertinent records of persons involved in criminal activity.

2. Along with other agents in my squad and task force officers working with the FBI's Joint Terrorism Task Force, I am currently investigating Michael Robert MOURA ("MOURA") and I am submitting this affidavit in support of an application for a criminal complaint charging MOURA with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

3. As described below, based upon the evidence gathered to date in this ongoing investigation, I have probable cause to believe, and do in fact believe, that on or about April 28, 2021, MOURA, knowing that he had been convicted of a crime punishable for a term exceeding one year did knowingly possess two firearms, namely one Glock model 22 .40 caliber pistol, bearing serial number KCC700, and one Colt model M16 A2 rifle, bearing serial number 8108394, said firearms having been shipped and transported in interstate commerce, in violation of 18 U.S.C. § 922(g)(1).

4. The information in this affidavit is based upon my training and experience, my

personal knowledge of this investigation, and information conveyed to me by other agents and law enforcement officials who have assisted in this investigation. Because this affidavit is submitted for the sole purpose of seeking issuance of a criminal complaint, it does not include every fact known to me concerning the investigation. Instead, I have included only those facts that I believe are needed to establish the requisite probable cause to support the criminal complaint.

## RELEVANT LAW

5.  Title 18, United States Code, Section 922(g)(1), states: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

6.  Massachusetts General Law, Chapter 265, Section 43A, states: "Whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress, shall be guilty of the crime of criminal harassment and shall be punished by imprisonment in a house of correction for not more than 2½ years or by a fine of not more than $1,000, or by both such fine and imprisonment."

7.  Massachusetts General Law, Chapter 258E, Section 9, states that "[e]ach harassment prevention order issued shall contain the following statement," which includes: "Any violation of [a Harassment Prevention] order or a protection order issued by another jurisdiction shall be punishable by a fine of not more than $5,000, or by imprisonment for not more than 2 ½ years in a house of correction, or both."

## PROBABLE CAUSE

### MOURA's Harassment of Ex-Girlfriend and His State Criminal Conviction

8. In December 2018, FBI Boston received a tip that a woman whose identity is known to the government, but for reasons of safety and privacy will be referred to herein as complaining victim ("CV"), was being threatened online by a person calling himself "Matt Payne." Specifically, at least two of these threats stated: "would you watch a tape of [CV]'s dead body being raped?" and "we're going to fucking kill her and rape her." A subsequent investigation determined that the person threatening CV, using the name "Matt Payne," was in fact the CV's ex-boyfriend, MOURA, who is now a 27-year-old resident of Stoughton, Massachusetts.

9. CV then applied for and obtained a harassment prevention order ("HPO") under Massachusetts law prohibiting MOURA from sending harassing communications to CV, which was served on MOURA on or about October 8, 2019. Even after October 8, 2019, MOURA continued to send CV harassing and threatening communications.

10. On or about November 4, 2019, CV reported to the local police that, while she was at a concert in Worcester, her car's brake lines were cut. At the same time as CV's brake lines were cut, she had received harassing voicemails from a person whose voice she recognized as belonging to her ex-boyfriend, MOURA. Based on the harassing voicemails, a warrant was issued for MOURA's arrest, alleging that he had committed criminal harassment and violated a harassment prevention order.

11. On or about November 7, 2019, MOURA was arrested and his cellphone was subsequently searched. During the search of MOURA's phone, the police found at least three text messages MOURA sent to CV after October 8, 2019, the date on which the harassment prevention order had been served. According to a police report regarding those text messages, which I have

3

reviewed, one of MOURA's text messages to the CV read: "were getting intel about a situation involving you and we can get 20 dudes there to subert it but you're going t", "o have to come to the table before people start getting targeted. These chances will evaporate eventually, time to do business." [sic].

12. MOURA was charged with Criminal Harassment, in violation of Massachusetts General Law, Chapter 265, Section 43A, and Violation of Harassment Prevention Order in violation of Massachusetts General Law, Chapter 258E, Section 9. In or around April 2020, MOURA pled guilty to both charges and was sentenced to 166 days of custody in the House of Corrections. As set forth above, the statutory maximum sentence for each of these offenses is 2½ years in custody.

13. I have reviewed the Massachusetts State District Court forms, including a Tender of Plea or Admission and Waiver of Rights form, which reflect that during MOURA's guilty plea hearing he was advised about the maximum sentences for the offenses to which he was pleading guilty and that the sentences could be imposed consecutively. The Tender of Plea or Admission and Waiver of Rights was signed by MOURA and his attorney on April 21, 2020. Accordingly, I believe that MOURA understood and knows that he was convicted of at least one offense that carries a maximum sentence of 2 ½ years in custody.

**MOURA's Contacts with Undercover Law Enforcement Officers**

14. On or about May 18, 2020, MOURA spoke over the telephone with an undercover law enforcement officer, whose identity is known to the government but for safety reasons is referred to herein as "UC1." UC1 has been assigned to investigate groups that have professed a willingness to use violence to further their extremist political and social ideology. Through that investigation, UC1 received information that MOURA wanted a firearm. Thereafter, UC1 held

4

himself out to be someone with prior military experience who had access to firearms and could illegally obtain a firearm for sale. When they spoke, MOURA told UC1 that MOURA was recently released from prison and, in addition, MOURA asked UC1 about buying a firearm.

15.     On or about June 10, 2020, MOURA met an undercover law enforcement officer, whose identity is known to the government but for safety reasons is referred to herein as "UC2." MOURA and UC2 discussed MOURA's interest in purchasing a handgun. Specifically, MOURA told UC2 that he (MOURA) was "looking for something light, like a nine or something," or words to that effect, which, based on the context and my training and experience, I believe was a reference to a 9mm pistol. MOURA told UC2 that MOURA was willing to pay approximately $300 to $400 for the handgun. MOURA told UC2 that he had recently gotten out of prison and did not have the money for the gun yet. UC2 asked MOURA if MOURA was a felon. MOURA responded, "no, my ex put a restraining order on me."

16.     On or about June 12, 2020, UC1 told MOURA that the price (the $300 to $400 mentioned on June 10, 2020) MOURA wanted to pay for a firearm was too low. UC1 offered MOURA the opportunity to work for UC1 by making deliveries for UC1.

17.     On or about July 11, 2020, UC1 met MOURA in Massachusetts. MOURA said he could not buy a gun legally because he was on state probation. MOURA claimed that he wanted a gun for protection because he and his girlfriend were moving to Fall River, Massachusetts. MOURA told UC1 that MOURA was willing to make runs, *i.e.*, act as a courier for contraband for UC1, and take payment as credit toward buying a gun.

18.     On or about July 24, 2020, UC1 spoke to MOURA about making a delivery. There was no discussion of what would be delivered at that time but it was implied that the item or items to be delivered would be illegal in nature.

5

19. On or about August 5, 2020, UC1 gave MOURA $60,000 of counterfeit money in a locked zipper bag to courier from Andover, Massachusetts to Albany, New York. When UC1 gave MOURA the bag, he told MOURA that the $60,000 was "funny money," or words to that effect, meaning that the money was counterfeit. When he arrived in Albany, MOURA met an undercover law enforcement officer, whose identity is known to the government but for safety reasons is referred to herein as "UC3." UC3 paid MOURA $500 for making this delivery.

20. On or about August 27, 2020, MOURA told UC1 that he had already spent the money he had earned from the August 5, 2020 delivery.

21. On or about February 9, 2021, UC1 agreed to meet MOURA in West Bridgewater, Massachusetts.

22. On or about February 17, 2021, UC1 met MOURA in West Bridgewater. MOURA asked about purchasing a handgun from UC1. MOURA wanted to buy a handgun and pay between $500 and $1,000. MOURA wanted the handgun to be "off the street" and stated he did not need it to be "off the shelf."[1] MOURA agreed to conduct two deliveries that would be worth $500 each as credit of $1,000 toward the handgun purchase.

23. On or about March 18, 2021, UC1 gave MOURA $100,000 of counterfeit money in a locked zipper bag to courier from Saugus, Massachusetts to Newport, Rhode Island. UC1 told MOURA this delivery would earn MOURA $500 credit toward the purchase of a firearm. Upon arrival in Newport, Rhode Island, MOURA met an undercover law enforcement officer whose identity is known to the government but for safety reasons is referred to herein as "UC4." MOURA

---

[1] Based on the context and my training and experience, I believe that when MOURA said "off the street" he meant that the gun should be used, and that when MOURA said "off the shelf," he meant new, as if bought from a store.

and UC4 discussed the purchase price of a firearm. UC4 told MOURA that the price of the handgun depended on how clean the gun is. MOURA replied that the handgun "doesn't have to be straight up clean, as long as it doesn't jam on me."

24. On or about April 2, 2021, MOURA met with an undercover law enforcement officer whose identity is known to the government but for safety reasons is referred to herein as "UC5." UC5 gave MOURA $100,000 of counterfeit money in a locked zipper bag to courier from Newport, Rhode Island, to Brockton, Massachusetts. In Newport, Rhode Island, UC5 asked MOURA if MOURA was willing to deliver other stuff such as coke, a commonly-used term meaning "cocaine." MOURA said "that was fine" or words to that effect. In Brockton, Massachusetts, MOURA delivered the counterfeit money to UC4. MOURA told UC4 that he wanted to purchase a Glock handgun soon and was willing to pay cash in addition to the credit he had earned from the two deliveries, which I understand to refer to the March 18 and April 2 deliveries.

25. On or about April 15, 2021, UC4 sent a text message to MOURA asking, "you want the G thing still," to which MOURA replied "yes." In context, I understand "the G thing" to refer to a Glock handgun and believe that MOURA interpreted it the same way.

26. On or about April 16, 2021, UC4 sent a text message to MOURA asking, "How about Thursday 11 am same soit in brockton." In context, I understand "same soit in Brockton" to refer to the place where MOURA delivered the counterfeit money to UC4 on April 2, 2021, and I believe that MOURA interpreted it the same way.

27. On or about April 19, 2021, MOURA responded to UC4's April 16 message saying, "sure thing. ready to go then?" and "I can have 200 or so ready." Based on the context, I understand the reference to "200" to mean $200 in cash MOURA that was willing to pay for the Glock in

7

addition to the $1000 he had already earned from counterfeit money deliveries.

28. On or about April 20, 2021, MOURA and UC4 exchanged the following communications via text message:

| | |
|---|---|
| UC4: | I may be able to get you one of these if you want to wait until next week for the G. [UC4 attached a picture of an AK-47 to the text.] |
| MOURA: | not even sure what that is lol. do you not have the G? |
| UC4: | The G is good to go |
| MOURA: | how much is the one above? |
| UC4: | We can work something out. Guy is looking to move it. I can work a price but d9nt want to start negotiating if you don't need it. |
| MOURA: | not needed, but gonna need something like that eventually. I wanted an AR-15 at some point but not sure what the price would be |
| UC4: | OK do you want me to work on that now and see if I can get one and do everything at once. |
| MOURA: | yes. Just let me know the price. Depends on what it would be if I could swing it then or not. |

Based on my training and experience, information provided to me by other investigators, and the context of these communications, I understand that 'G' refers to a Glock handgun, and AR-15, refers to an AR-15 or AR-15-type rifle.

29. On or about April 21, 2021, UC4 and MOURA had the following exchange via text message:

| | |
|---|---|
| UC4: | I'm going g to Va beach now to meet up with some of my people down there. I am goji g ro be back next week with 3 AR's. I'll do you one for 600. |
| MOURA: | sounds good and so we were not doing tomorrow? |
| UC4: | No tomorrow. A week from today. Next Wednesday. On the AR do you want it to go pew pew pew. Or BRRRRRRRT. |
| MOURA: | the 15? Brrrrt. |

8

| | | |
|---|---|---|
| | MOURA: | whatever sounds better lol. |
| | UC4: | Ok. I'm throwing the G in on top for fucking around d on the timing. I like to try and do multiples at each meet. Reduces our exposure. See you next Wednesday same place. If I can get a pic I'm send you. We will have access to more when. I make this trip to Va. |
| | MOURA: | so just 600 and call it even? "food" included? Is that fine? |
| | UC4: | Yep. |
| | MOURA: | awesome. Ammo for the AR too?  appreciate it. |

Based on my training and experience, information provided to me by other investigators, and the context of these communications, I understand that when UC4 asked MOURA whether MOURA wanted the AR to go "pew pew pew" or "BRRRRRRRT," UC4 was asking whether MOURA wanted a semi-automatic or fully automatic weapon. I further understand that when MOURA responded "brrrrt" and "whatever sounds better lol," MOURA showed that he understood UC4's question and wanted a fully automatic weapon.

30. On or about April 26, 2021, UC4 and MOURA had the following exchange via text message:

| | | |
|---|---|---|
| | UC4: | What's up heading back to Boston tonight with these puppies. One is full rock and roll for you.BRRRRRRRRRRT. [UC4 attached a picture of three AR rifles to the text message] |
| | MOURA: | beautiful!!!! [smiling emoji] you have the G pic? |

31. On or about April 27, 2021, UC4 and MOURA had the following exchange via text message:

| | | |
|---|---|---|
| | UC4: | What's up kid here is the pic again. Can we meet at 9 at the mall. I am driving through the night and want to meet early to get home for some sleep… [UC4 attached a picture of the Glock handgun to the text message] |
| | UC4: | Then I may play a little golf…. |
| | MOURA: | awesome! And 9AM tomorrow morning? |

9

| | |
|---|---|
| UC4: | Yes brockton mall. |
| MOURA: | yes thats fine. |
| MOURA: | 600 right? |
| UC4: | Yup 6. |
| UC4: | Hundred. |
| MOURA: | sweet. What round is the g btw? That looks incredible.. |
| UC4: | 0.4 |
| MOURA: | dope! |

**Events of April 28, 2021**

32. Based on my personal observations and as relayed to me by other investigative agents, on or about April 28, 2021, at approximately 8:40 a.m., MOURA arrived at the Westgate Mall in Brockton, Massachusetts, driving a white Toyota Camry with Massachusetts license plate 1VZ186. UC4 was also parked in the parking lot. MOURA got out of his car, walked over to where UC4 was parked and got into UC4's vehicle.

33. Once MOURA got into UC4's vehicle, UC4 showed MOURA a Glock model 22, .40 caliber handgun, bearing serial number KCC700. MOURA handled the handgun.

34. UC4 then showed MOURA a Colt M16 model rifle (this is an AR-15 style rifle). While UC4 showed the MOURA the rifle, the rifle remained in a black hockey bag in the backseat of UC4's vehicle. With the rifle in the hockey bag, in the back seat of the vehicle, UC4 showed MOURA the rifle selector switch that allows the rifle to fire fully automatic.

35. MOURA handed UC4 $600 cash, left UC4's vehicle and took the black hockey bag with him. In the bag were: (1) a Glock model 22 .40 caliber pistol, bearing serial number KCC700; (2) a Colt model M16 A2 rifle, bearing serial number 8108394; (3) three Glock .40 caliber magazines; (4) two M16 rifle magazines; (5) 183 rounds of 9mm ammunition; (6) 162 rounds of

10

.223 caliber rifle ammunition; and (7) approximately 10 green zip ties.

36. MOURA walked back to his Toyota and placed the black hockey bag in the back seat of his car. MOURA then returned to UC4's vehicle and got back into it. UC4 and MOURA then drove to a Bank of America ATM a short distance from where MOURA had parked his car. As they drove, MOURA told UC4 that he (MOURA) was "trying to stockpile as much as I can because with this fucking administration you don't know what the fuck is going to happen." MOURA continued, "I don't want to be on any kind of list, you know what I mean, because when they try and confiscate guns, like, it's all those people."

37. At approximately 8:52 a.m., UC4 got out of his vehicle. Agents and officers who had been surveilling the meeting then arrested MOURA.

**Interstate Nexus**

38. I know, based on my training and experience, and information relayed to me by Special Agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives, that no Glock firearms and no Colt firearms are manufactured in Massachusetts. Therefore, both the Glock model 22 .40 caliber pistol, bearing serial KCC700, and the Colt model M16 A2 rifle, bearing serial number 8108394, that MOURA possessed in Brockton, Massachusetts on April 28, 2021, must have been shipped or transported into Massachusetts in interstate commerce.

## CONCLUSION

39. Based on the foregoing facts and on my experience, training, and discussions with other individuals involved in this investigation, I have probable cause to believe, and I do in fact believe, that MOURA possessed a firearm in violation of 18 U.S.C. § 922(g)(1).

JAY M. LYNCH
Special Agent, FBI

Subscribed and sworn to before me via telephone on April 28, 2021

HON. MARIANNE B. BOWLER
United States Magistrate Judge